Nellie May **SHELTON**, a/k/a Nellie Mae
Shelton, Plaintiff,

v.

Charles Thomas **JONES**, Sr. and Lemon
Jacob Bennett, Defendants.

Civ. A. No. 1364.

United States District Court
W. D. Virginia,
Roanoke Division.

June 27, 1967.

William G. Anderson, Roanoke, Va., for plaintiff.

James C. Turk, Dalton, Poff, Turk & Stone, Radford, Va., for defendant Jones.

Linwood Holton, Eggleston, Holton, Butler & Glenn, Roanoke, Va., for defendant Bennett.

## MEMORANDUM OPINION

MICHIE, District Judge.

After three trials, this case is again before the court on motions by the de-fendants. At the first trial, held in April, 1964, at the conclusion of the plain-tiff's evidence the defendants moved for a directed verdict and, without introduc-ing any evidence, rested. A hung jury resulted. Defendants then renewed their motions which I granted on the ground that there was no evidence in the record upon which the jury could base a finding of negligence. The Court of Appeals re-versed, finding that the record did con-tain evidence from which the jury could conclude that each of the defendants had failed to keep a proper lookout. The sec-ond trial of this case, held June 2nd and 3rd, 1966, also resulted in a hung jury. The case was then tried a third time the following week on June 8 and 9, 1966, at which time the jury returned a verdict in favor of the plaintiff for $45,000. De-fendants have moved for a judgment not-withstanding the verdict on the ground that there is no evidence in the record up-on which the jury properly could have found negligence. In the alternative, they have moved for a new trial urging that the verdict is contrary to the law and the evidence and is plainly wrong, and that the procedure by which the jury was selected was improper. I find no merit in either motion and, therefore, conclude that the verdict must stand.

Turning first of all to the defendants' motion for a judgment notwithstanding the verdict, it appears from the evidence developed in all three trials that the plain-tiff, Miss Shelton, in freezing weather and after dark was traveling east on Route 11 a few miles west of Salem, Vir-ginia. Earlier in the day, there had been some snow which, as the temperature had hovered about the freezing point, had melted on the roadway leaving it wet in places but, upon a bridge some eleven miles west of Salem had turned into ice. As soon as Miss Shelton entered upon the bridge, her automobile began to skid and fishtail. She attempted to bring her car to a stop and, as she had not been driving very fast, did so in about 150 feet from the beginning of the bridge, causing her engine to stall in the process. Her car came to a stop slighty askew, blocking

both of the eastbound lanes in which she had been traveling. She attempted to restart the engine in order to extricate herself from the dangerous position and to continue on her way.

Before Miss Shelton could restart her automobile, the defendant Jones, who had been traveling behind her, also came upon the bridge, saw her car in front of him and applied his brakes. However, as he also was upon the ice, he was unable to stop and collided with the rear end of Miss Shelton's car, throwing her out of the car and some distance across the roadway. She picked herself up and approached the Jones vehicle. At this time, the defendant Bennett, who had been traveling behind Jones, saw the vehicles in irregular positions in the road ahead of him. He, too, attempted to stop by applying his brakes, but by that time he also was on the ice. Unable to stop, he crashed into the Jones vehicle, causing Miss Shelton to be struck and sustain substantial injury.

The facts recited above are a paraphrase of the facts which the Court of Appeals concluded gave rise to a jury issue as to the defendants' failure to keep a proper lookout. Shelton v. Jones and Bennett, 356 F.2d 426 (4th Cir. 1966). They are based upon the testimony of Miss Shelton and that of a highway patrolman who recounted the statements made to him by Jones and Bennett shortly after the collision. Each of the defendants had told the patrolman that he was traveling at approximately 45 miles per hour, that he applied his brakes as soon as he saw signs of the obstruction in the roadway ahead, but, when his brakes were applied, he was on the ice and was helpless.

The Court of Appeals agreed that neither one of the defendants could be held at fault for his actions and for what occurred after he saw the obstruction upon the bridge and applied his brakes. Each could have done no more than he did. However, the court did feel that there was evidence from which the jury could reasonably have concluded that either or both the defendants had failed to keep a proper lookout. The court said at p. 428:

> The road was straight for some distance before the bridge was reached. It was well after sunset, but there was neither fog nor rain, and the testimony discloses no traffic headed in the opposite direction with confusing or blinding headlights. Neither defendant reacted until he was already on the ice and, at least, within 150 feet of the obstruction ahead. There is no intimation in the evidence, however, that Jones, had he been looking, could not have seen the taillights of the Shelton automobile waver back and forth as that vehicle fishtailed and went into its skid, or indeed, that his headlights would not have revealed her stalled vehicle askew in the eastbound lanes in front of him well before he came within 150 feet of it.

The same thing may be said of Mr. Bennett. * * *

■■ Whether or not the plaintiff is entitled to go to the jury is a matter in this case dependent upon the law of Virginia. Crosby v. Meredith, 300 F.2d 323 (4th Cir. 1962). The motion for judgment notwithstanding the verdict is, in effect, the same as renewing the earlier motion for a directed verdict and, therefore, the standard by which it is to be judged is supplied by the state law. Minton v. Southern Railway Co., 368 F. 2d 719, 720 (6th Cir. 1966); United States v. Simmons, 346 F.2d 213 (5th Cir. 1965); Moore, Federal Practice, Vol. 6A, § 59.08[5] at p. 3814 et seq.

As a practical matter, it makes little difference whether state or federal law is controlling since the general standard is:

> The questions presented on this appeal are whether the district court erred in denying defendant's motion for a directed verdict and a judgment notwithstanding the verdict. In considering a motion for a directed verdict, the "trial judge must view the evidence in the light most favorable to the plain-

tiff. \* \* \*" *Only if reasonable minds could arrive at but one conclusion and that in favor of the defendant should a verdict be directed.* \* \* \* [Emphasis added].

Minton v. Southern Railway Co., 368 F. 2d 719, 720 (6th Cir. 1966); and the standard applied by the Virginia courts is:

Our inquiry is whether reasonable minds could differ in regard to the facts and the proper inferences to be drawn therefrom.

Charles v. Commonwealth Motors, Inc., 195 Va. 576, 577, 79 S.E.2d 594 (1954). These standards are virtually identical. For precedents, however, illustrating the applicability of the standard to a given set of facts, I have drawn upon Virginia law.

Cook, Administrator v. Virginia Holsum Bakeries, Inc., 207 Va. 815, 153 S. E.2d 209 (1967) is relevant. A collision had occurred at night on a two-lane road between plaintiff bakery's tractor-trailer which was traveling north and a southbound automobile driven by Marvin Lucas, defendants' decedent. The determination of fault turned upon whether the accident took place in the northbound or the southbound lane. The physical evidence supported either conclusion. The driver of the tractor-trailer had, on two occasions, by the testimony of the investigating patrolman denied knowledge of how the accident occurred. At trial, the driver denied ever having made these statements and testified instead that the automobile had suddenly swerved into the northbound lane immediately in front of him. The jury rendered a verdict for the defendant, but the trial judge set it aside and entered judgment for the plaintiff. On review, the Virginia Supreme Court of Appeals concluded that since the driver's credibility as a witness had been attacked, the jury was free to disbelieve his testimony. Finding a conflict in the expert testimony as to the conclusions to be drawn from the physical evidence and finding that the location of the debris gave rise to conflicting in-

ferences, the court said at p. 820, 153 S.E.2d at p. 213:

In view of the conflicts in the evidence and the inferences that may be drawn from the facts proven, it cannot be said that reasonable men could conclude only that Lucas caused the accident by negligently crossing into the northbound lane in the path of plaintiff's vehicle. Hence it was error for the trial court to set aside the jury's verdict for the defendant and enter a judgment for the plaintiff.

In Giannone v. Johnson, Admx., 204 Va. 493, at p. 496, 132 S.E.2d 445, at p. 447 (1963) where the question was whether the court had improperly withdrawn the issue of plaintiff's contributory negligence from the jury, the court said:

We are not unmindful of the fact that the verdict of the jury at the first trial has been set aside by the trial court, and that it is not, therefore, entitled to the same weight as a jury verdict which has been approved. However, we must not overlook the principle, of equal dignity, that questions of negligence, whether contributory or primary, are ordinarily for the jury to decide. [Citations omitted.]

A determination, as a matter of law, that a party is guilty of, or is free from, negligence should be made only where the evidence is such that reasonable men could reach but one conclusion thereon; where fair-minded men, weighing the evidence and drawing all just inferences therefrom, would not differ in their views with relation thereto; where the evidence is without conflict and permits of one, and only one, fair result.

Plaintiff's decedent who had died as the result of a collision of his car with the rear end of a police patrol car had recounted that the tail end of the patrol car extended onto the highway into his path of travel but that he was precluded from seeing it by the lights of another police vehicle shining across his path but not onto the car which was struck. The court

concluded that his ability to see the stopped police car and his failure to take action to avoid it were questions of contributory negligence properly submitted to the jury where there were conflicts in the testimony as to the location of the police vehicles, whether the taillights of the struck vehicle were on and the direction in which the allegedly blinding light was shining.

The previous opinion of the Court of Appeals in the instant case while concluding that the evidence developed at the first trial, as recited above, gave rise to a jury issue, leaves only one question open: whether the defendants were negligent in failing to keep a proper lookout. If the evidence adduced at the third trial was such that reasonable men could reach only one conclusion, that defendants did keep a proper lookout, then, and only then, may their motions be granted.

At the third trial, unlike the first trial where the court had before it only the testimony of the plaintiff and the patrolman, testimony by both of the defendants and several other witnesses was presented. This additional evidence, the defendants contend, satisfies all the open questions which they feel prevented the Court of Appeals from affirming the earlier directed verdict, thereby making the present motion for a judgment notwithstanding the verdict proper. I cannot agree.

The defendant Jones and the passengers in his vehicle testified, contrary to plaintiff's story, that the initial collision did not cause her to be thrown from her car. Also, their testimony would place the time interval between the first and second collisions at 3 to 5 minutes rather than a matter of seconds as plaintiff estimated. If accepted as true, this evidence would suffice to raise an issue, not pursued by the defendant Jones, that his collision was not the proximate cause of the serious injuries inflicted on the plaintiff by the subsequent impact with Bennett's car. However, it in no way negates a finding that either or both of the defendants failed to keep a proper lookout. Evaluating the defendants'

evidence with respect to this point, it appears that with the exception of testimony concerning the headlights of oncoming cars, the additional evidence presented at the third trial strengthened rather than weakened plaintiff's case.

Although it had been raining, and the road was wet in spots, apparently no rain or snow was falling at the time of the accident. According to the testimony of both defendants, their vision was not obstructed by spattering on the windshields. Both had an unobstructed line of sight upon the scene of the accident for about a half mile. Testimony by the defendant Jones is to the effect that as he approached the bridge from the west, even though the road ahead was visible for at least a half mile, he was unaware that plaintiff's car was ahead of him. Traveling in the furthest right lane of the four-lane highway, he claims, just before entering upon the bridge, to have passed an oncoming car located in its right-hand lane, which necessitated his dimming his lights. The fact of the oncoming car is corroborated by the testimony of his two passengers. Miss Shelton, however, testified that from the time she started across the bridge until she was struck by the defendant Jones, no cars crossed the bridge going west. The defendant Jones further testified that he first saw plaintiff's automobile in its perilous condition after the oncoming car had passed and when he was about twenty feet from the bridge which would have placed him approximately 170 feet from the spot where the collision occurred. The defendant's theory is that he was precluded from perceiving plaintiff's danger by the lights of the oncoming car and that once that vehicle had passed, he was too close to the icy bridge to come to a stop. Although the testimony clearly shows that he dimmed his lights, never once, even in response to direct questioning by counsel did the defendant Jones ever claim to have been blinded by the lights of the oncoming car. Casting further doubt upon the theory that the approaching lights affected his visibility is the fact that both cars were traveling

in their respective right lanes, minimizing any blinding effect the headlights might have had.

In a deposition taken two years before, the defendant Jones testified that he did not see the plaintiff's vehicle until it was about 20 feet away. This prior inconsistent statement was allowed to come in as it reflected upon the credibility of his present testimony. Indeed, this defendant's version is weakened by his own witnesses who, while testifying as to the oncoming car, indicated that the defendant might not have perceived plaintiff's vehicle until it was between 50 and 100 feet away. This estimate indicates inattention on the defendant's part as the oncoming car would long since have passed and the plaintiff's vehicle would have been well within the range of the defendant's headlights.

■ It was for the jury to resolve the conflict between the defendant Jones' testimony and that of Miss Shelton as to whether he was faced with an oncoming car. Assuming that he did pass a car, it was for the jury to determine whether the headlights so affected his vision as to excuse his failure to see plaintiff's car. Keeping in mind that his credibility was attacked and that other defense witnesses disagreed as to the point at which plaintiff's car was first observed, this, also, was a fact which the jury had to ascertain. Lastly, even accepting as true that the defendant Jones did pass a car and that he did not see the plaintiff's vehicle until but 20 feet from the bridge. I feel that it was still reasonable for the jury to infer that recognition of danger and action to avoid it should have occurred sooner.

The same general conditions with respect to visibility, road conditions and weather, of course, apply to the defendant Bennett. He, also, claims to have passed an oncoming car, dimming his headlights, just before coming upon the bridge. However, he did state under examination that he was upon the bridge before he sighted anything unusual ahead and the first thing that he noticed was not the lights of the cars which it is established were on, but rather the shadowy form of Miss Shelton crossing the road in an attempt to get out of his way. Significantly, one of the passengers in the defendant Jones' car testified that he could see the approach of Bennett's automobile for a considerable period of time and over a considerable distance and that, because of this, he was able to remove himself from its path, permitting the inference that Bennett's visibility of the accident site was equally unhindered. Although Bennett claims to have dimmed his lights and passed an oncoming car near the end of the bridge, he does not claim that he was blinded by its headlights. In short, the additional evidence, if anything, gives plaintiff a stronger case than she had in the record upon which the Court of Appeals found that the jury could infer negligence on Bennett's part.

■ Defendants have sought assistance from the evidentiary principle that the plaintiff by calling them as adverse witnesses is bound by their testimony to the extent that it is reasonable and uncontradicted. This is the accepted rule in Virginia. Crabtree v. Dingus and Salvers, 194 Va. 615, 74 S.E.2d 54 (1953). But it is of little help to these defendants when their testimony consisted either of self-serving declarations as to the ultimate fact in issue, or with particular reference to the defendant Jones, was in conflict with the testimony of other witnesses.

■ It is the role of the jury to assess the credibility of witnesses and to resolve conflicts in testimony. Both were necessary in this case. It is also the province of the jury to draw reasonable inferences from the evidence. Reasonable men would not be compelled to reach only the conclusion that the defendants did keep a proper lookout and, therefore, the motion for a judgment notwithstanding the verdict is denied.

Turning now to the motion for a new trial, defendants have urged most forcefully that the jury which rendered the

verdict in favor of the plaintiff was improperly constituted in that it included a higher percentage than normal of persons in the lower economic strata. They assign for this the reason that the Clerk used an extraordinary, and therefore improper, method of drawing the panel which unintentionally, but inevitably resulted in the panel being comprised as it was.

The end of the second trial came at about 10:00 P.M. on Friday, June 3rd. After the court had overruled defendants' motions for directed verdicts, a discussion ensued concerning a new trial date. Because the plaintiff had to return to California and because of conflicts in the schedules of the counsel involved, it was suggested that the case be tried again during the next week. The Clerk was then consulted as to the earliest date he would be able to convene another jury and he allowed that he could probably do so by Wednesday, June 8th, which was then agreed upon by counsel as the date on which the third trial should begin. This gave the Clerk just four days, the weekend and two regular working days, within which to convene a jury panel.

On the morning of June 8, 1966, counsel for both defendants advised the court that they did not consider the jury panel present for the third trial fairly representative of a cross section of the community and requested permission to examine the Clerk to determine the manner in which the jury panel had been selected.

Out of the presence of the jury panel, the Clerk was sworn and was questioned by defense counsel and by the court as to the procedure normally followed and as to the procedure followed in the selection of the panel in question. From his testimony it was established that in the Roanoke Division of the Western District of Virginia it was the practice at the time for the Clerk and the Jury Commissioner to meet perhaps two weeks before the beginning of each six month term and draw in accordance with the statutory procedure enough names to result in a panel of about forty jurors who would be on call for that entire term. Summonses are prepared in the Clerk's office and mailed through the Marshal's office approximately ten days in advance of the date for which the presence of the jurors is required. This process is commenced with respect to a given panel to secure their presence at the first day of term and is repeated for each occasion during the term for which their services are needed. The initial summons puts the panel on notice that their services will be required for the entire term.

Requests to be excused from service inevitably are forthcoming at the time of the initial summonsing and at such times as the panel is subsequently called. These requests, the Clerk testified, whenever received by the Clerk's office are referred to the Judge, as the Clerk in this district had no direct authority to issue excuses from service.

The Clerk also explained that the regular panel, drawn during May, had been exhausted by the June 2nd trial and for this reason it had been necessary to convene a special panel. Had the normal procedure for selection and summonsing been followed the summonses would not have been mailed until Monday afternoon and would not have been received by the prospective jurors until Tuesday or perhaps even Wednesday morning. The Clerk acknowledged that in this instance an extraordinary procedure had been followed, but that this procedure was necessitated by the need for a jury four days hence and, further, that it was only by the contemplated use of this procedure that on Friday he had been able to promise a jury for the following Wednesday.

On Saturday morning, June 9, the Clerk testified, he and the Jury Commissioner met at the Clerk's office. They alternatively drew from the jury box until thirty-one names had been selected. The Clerk and his deputies then telephoned the persons whose names had been drawn, informing them that they were to report to the Federal court for jury duty. The Clerk considered that since a jury could not have been convened in

time by any other procedure that he had implicit authority to excuse those who in his opinion had a good reason for not being present. Only nineteen of the thirty-one persons whose names were drawn from the box were present in court. Of the twelve not present, one was directed to report but did not come. Another person was deceased. Though the Clerk and his deputies continued attempts to reach them until Tuesday afternoon, three persons were never located. Three others were on vacation. Four other persons were told that they need not appear because of sickness, inability to arrange for a substitute on such short notice, or for some other reason which the Clerk deemed compelling.

The defendants have urged that this procedure, followed by the Clerk in order to summons the panel, naturally resulted in an exclusion from the panel of those persons of means who would be more likely to be away on vacation at this time of year and who would usually be doing something which they could not well afford to miss.

■■ It is, of course, true that the names which are placed in the jury box must, to the extent possible, represent a true cross section of the community. See Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966). However, a litigant has no right to have the particular panel before which his case is tried representative of a cross section of the community. Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). The right which the litigant does have is summed up well by the Supreme Court in *Thiel* where it says at p. 220; 66 S. Ct. at p. 985:

This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographic groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups.

*Thiel,* and the majority of other cases which have passed upon the issue of the proper composition of a jury have involved improper procedures with respect to choosing names which go into the jury box rather than the method by which the jurors are summoned to make up a particular panel. However, all of these cases show a primary intent to maintain the integrity of the jury system and, therefore, are sufficiently similar to allow analogy.

■ It is true that Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), cited by defendants, might be read to support the proposition that any departure from the statutory scheme of jury selection set out in 28 U.S.C.A. §§ 1863 through 1867 will bring reversible error into a case regardless of the fact that there is no showing of actual prejudice. However, in view of later cases, I am of the opinion that *Ballard* should not be so read but that the holding must be confined to the facts of the case. So construed, *Ballard* supports the proposition that it is only the *intentional* exclusion of an eligible *class* or *group* in the community which will cause the invalidation of a verdict.

United States v. Flynn, 216 F.2d 354 (2d Cir. 1954), cert. denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955), dealt with the degree of discretion which could be allowed jury clerks in determining the fitness to serve of those persons whose names were to be placed in the jury box. Foremost among the asserted objections was that the clerks had and exercised the prerogative of excluding persons for financial hardship. The court justified its finding that the clerk's excusing of persons on this ground did not render the resulting jury defective on the basis that excusing jurors was largely an administrative function with which the

court should not reasonably be expected to concern itself. Furthermore, the court underscored the need for a showing of intentional exclusion when it said at p. 388:

> We conclude that appellants failed to show intentional and systematic discrimination in the jury selection process during any part of the period under attack.

In United States v. Kelly, 349 F.2d 720 (2d Cir. 1965), the defendant raised the objection that the jury which convicted him had been improperly constituted. The court at p. 778 phrased the issue as follows:

> The next claim is that the Civil Rights Act of 1957 precludes the practice whereby the jury clerk and his assistants excuse the large numbers of persons who have received notices to appear as prospective jurors but who claim and demonstrate that such service would impose undue financial hardships.

Finding nothing in the Civil Rights Act which would proscribe this exercise of discretion on the part of the jury clerks, the court, citing United States v. Flynn, supra, went on to say:

> Nor do we find anything which undermines the proposition that, as a practical matter and subject to proper supervision by the District Courts, jury officials must be vested with a large measure of discretion to determine whether a particular individual should or should not be excused from jury service.

 The decided cases find nothing wrong with the fact that the jury clerks, even absent express judicial authority, excuse certain persons. Objection arises only when it can be shown that there was an intentional exclusion of a certain class or group of persons. Such an intentional exclusion will serve to invalidate a verdict even where, as in *Thiel*, it is done with the implicit approval of the district judge.

 A review of the present facts fully illustrates that the procedure followed by the Clerk was the only practical method by which a jury could be secured in time for the trial. It is often the case that with names newly removed from the jury box, a substantial number of persons are found either to have moved from the district, to have become too old or too infirm, and perhaps even to have died. Had the Clerk chosen the normal method of mailing the summonses, he would have had no assurance of how many people would have been present at the time of the trial. If reliance had been had upon summonses sent by registered mail, even if it had been possible to send them out on Saturday, they would not have reached the addressees until Monday and many perhaps not even until Tuesday morning. This would have left those summoned no time within which to alter their plans in order to be able to be present on Wednesday morning. Keeping in mind the administrative difficulties and common courtesy to the prospective jurors, it seems clear to me that the Clerk employed the only proper method.

The point has been raised by the defendants that the jurors who appeared in court on Wednesday morning were no more than volunteers. Certainly, an individual who is contacted by an official of the United States Court, even though it be by telephone, and responds to a request that he be present for jury duty is not a mere volunteer in spite of the fact that he receives his summons upon his appearance at the place to which he was directed. Compare Romney v. United States, 83 U.S.App.D.C. 150, 167 F. 2d 521 (1948), cert. denied, 334 U.S. 847, 68 S.Ct. 1512, 92 L.Ed. 1771 (1948). It further belies the assertion to note that the Clerk excused only for what can be said to have been good cause and that all the persons not so excused, with one exception, were present at the time of the trial. I conclude, therefore, that the procedure used to summon the jury, while extraordinary, was necessitated by the circumstances. In any event, it does not

give rise to such error as to vitiate the verdict and require a new trial.

As defendants have also asked for a new trial on the ground that the verdict is contrary to the law and the evidence, I now turn my attention to this contention. With respect to the duty incumbent upon a motorist to exercise due regard for the safety of others, the jury was instructed that:

.. The duty to exercise ordinary care to keep a proper lookout involves not only the duty to look when such looking would be effective, but also the duty to see what an ordinarily prudent person exercising ordinary care would have seen under the circumstances then and there existing, and a person who keeps a lookout but fails to take advantage of what it reasonably discloses is as negligent as one who fails to keep a lookout.

The instruction is proper under Virginia law. Richmond Greyhound Lines. Inc. v. Brown, 203 Va. 950, 953, 128 S.E.2d 267 (1962); Matthews v. Hicks, 197 Va. 112, 115, 87 S.E.2d 629 (1955). On the basis of this instruction and drawing the inferences permitted from the evidence, the jury concluded that both defendants were negligent.

A trial judge is empowered to grant a new trial and, in fact, must do so when a clear injustice has occurred. But while the trial judge may not approve a clearly erroneous verdict, at the same time, he should not upset a verdict merely because he disagrees with the result if a reasonable basis exists in support of the jury's conclusion. Aetna Casualty & Surety Co. v. Yeatts, 122 F.2d 350 (C.C.A. 4th Cir. 1941). Since I believe that the verdict is not without a reasonable basis and, further, that there was no serious error in the trial or its result, the motion to set the verdict aside and for a new trial is denied.

The defendants' motions are denied, the jury verdict in favor of the plaintiff will stand, and an order will be entered in accordance with this opinion.