**UNITED STATES of America**

v.

**Edd C. DOUGLAS, Eddie Franklin Douglas, Elbert Douglas, Jr., Arthur Jackson Douglas, Wesley James Wilson, Cynthia Tamplin, Altonio Oshea Douglas, Orpheus Hill, Burvon King, Jr., Mary Jane Fike, Chauncey Mosley, and James Weldon Campbell.**

Civ. A. No. 4:92–CR–141–Y.

United States District Court, N.D. Texas, Fort Worth Division.

Oct. 7, 1993.

MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS THE INDICTMENT PURSUANT TO 28 U.S.C. § 1861, ET SEQ.

J. Michael Worley, Paul E. Gartner, Jr., Fort Worth, TX, for U.S.

Charles Friedman, Fort Worth, TX, for defendant Edd C. Douglas.

Gerald Goldstein, Cynthia Orr, San Antonio, TX, and John Linebarger (local counsel), Fort Worth, TX, for defendant Eddie Franklin Douglas.

William Ray, Fort Worth, TX, for defendant Elbert Douglas, Jr.

John Sweeney, Fort Worth, TX, for defendant Arthur Jackson Douglas.

Bryan Buchanan, Fort Worth, TX, for defendant Wesley James Wilson.

Leon Haley, Jr. (indictment through trial), and Louis Sturns (motion to dismiss), Fort Worth, TX, for defendant Cynthia Tamplin.

Don Gandy, Fort Worth, TX, for defendant Altonio Oshea Douglas.

Michael Berg, Fort Worth, TX, for defendant Orpheous Hill.

Michael Ware, Fort Worth, TX, for defendant Burvon King.

Richard Alley, Fort Worth, TX, for defendant Mary Jane Fike.

Bill Chambers, Fort Worth, TX, for defendant Chauncey Mosley.

Michael Heiskell, Fort Worth, TX, for defendant James Weldon Campbell.

MEANS, District Judge.

Pending before the Court is defendant Eddie Franklin Douglas's Motion to Dismiss the Indictment Pursuant to 28 U.S.C. § 1861, *et seq.*, and for Discovery Concerning Jury Selection Pursuant to 28 U.S.C. § 1867(f), which was filed in the above-styled and numbered cause on August 13, 1993.[1] Prior to the filing of the motion, Defendant examined the jury clerk's records pursuant to § 1867(f), and to the extent that Defendant's motion requests discovery of those records,[2] it should be and is hereby RENDERED MOOT. A hearing was held regarding the motion to dismiss on September 1, 1993. After careful consideration of that portion of the motion, the response thereto, the evidence adduced at the hearing, and the applicable law, the Court finds that the motion lacks merit and should be denied.

Defendant's motion alleges that his constitutional rights were violated because the venire in this cause did not represent a fair cross section of the community.[3] Specifically, Defendant argues that African–Americans were underrepresented on the panel. Defendant also complains that the alleged underrepresentation constituted a violation of his right to equal protection. Finally, Defendant argues that the method employed to select Defendant's venire violated this Court's Jury Plan and the Jury Selection and Service Act of 1968. *See* 28 U.S.C.A. §§ 1861–78 (West.

---

1. In accordance with paragraph ten of the February 16, 1993 pretrial order and pursuant to the order filed on August 2, 1993, defendant Eddie Franklin Douglas's motion to dismiss the indictment was deemed applicable to all defendants unless they filed a written notice of their intention to "opt out" of the motion. As of this date, the Court has received such a notice from defendant Arthur Jackson Douglas and from defendant Elbert Douglas, Jr., as to only the accounts for which he was acquitted.

2. In this regard, the Court notes that although the title of the motion requests discovery pursuant to § 1867(f), Defendant does not make such a request in the body of his motion, and, as noted, he has already been granted such discovery.

3. The Court notes that Defendant's constitutional objections to the racial makeup of the jury panel have already been denied. Defendant initially made his constitutional arguments orally on April 5th in the form of a motion to strike the venire. Defendant filed a memorandum in support of his oral motion to strike the panel on April 6th. On April 8th, the Court issued a one-paragraph order denying the motion to strike the jury panel. Nevertheless, the Court has decided to consider the evidence adduced at the September 1st hearing as it relates to Defendant's constitutional arguments.

1966 & Supp.1993). The Court will address each of Defendant's arguments in turn.

## I. ALLEGED CONSTITUTIONAL VIOLATIONS

As indicated, Defendant insists that his venire was not drawn from a fair cross section of the community. Defendant further alleges that his rights under the equal protection clause were violated by substantial underrepresentation of African–Americans on the venire. After careful consideration of each of these arguments, the Court finds that they lack merit.

### A. Fair Cross Section Violation

#### 1. Legal Framework

██ In order to prove, prima facie, a fair cross section violation,

the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *see also United States v. Hawkins,* 661 F.2d 436, 442 (5th Cir.1981) (quoting *Duren* ), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982). Defendant need not show purposeful discrimination in order to establish a fair cross section violation; if the method of jury selection used results in systematic discrimination against a cognizable group, a violation is shown. *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26. Once the defendant demonstrates a prima facie case, the government must point to "a significant state interest [that is] manifestly and primarily advanced by those aspects of the jury selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.* at 367–68, 99 S.Ct. at 670–71.

#### 2. Analysis

After careful review of the evidence presented at the hearing, the Court finds that Defendant has failed to set forth, prima facie, a fair cross section violation. Defendant established the first requisite of a prima facie case, as there is no question that the group which he contends has been underrepresented, namely African–Americans, is a distinct group in the community. The evidence adduced at the hearing further establishes, however, that African–Americans have been fairly and reasonably represented on venires in the Fort Worth division.

██ In support of his claims, Defendant presented evidence that the African–American population in the Fort Worth division is approximately 10.4103 percent.[4] That figure, which represents the percentage of African–Americans in the gross population of the division, is irrelevant for Sixth Amendment purposes, however, as the pertinent community for a fair cross section analysis is the pool of African–Americans in the division "who are *eligible* to serve as jurors." *United States v. Brummitt,* 665 F.2d 521, 529 (5th Cir.1981), *cert. denied,* 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852 (1982); *see also United States v. Apodaca,* 666 F.2d 89, 92–93 (5th Cir.) (holding that the defendant failed to establish a prima facie case where he only introduced evidence regarding the percentage of blacks in the gross population rather than the percentage of blacks in the population that were eligible to serve), *cert. denied,* 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 58 (1982).

██ Defendant also presented evidence, however, that in a sampling undertaken by the Administrative Office of the United States, ten percent of the qualified jurors who were "sampled" were African–American.[5] Over the thirteen-month period pre-

---

4. Defendant obtained this information from the 1990 census, which was introduced at the hearing and admitted as Exhibit A.

5. The Administrative Office's sampling, which was offered and admitted at the hearing as Defendant's Exhibit B, is a random sample of a certain number of qualified jurors from the master jury wheel filled in 1989. Because Exhibit A,

ceding the selection of the venire in Defendant's case, African–Americans represented 7.66 percent of those persons summoned to serve. Thus, the difference between the percentage of those qualified to serve on venires and those who actually were summoned to serve on them is only 2.34 percent. Such a disparity certainly falls within the permissible parameters and therefore fails to establish, prima facie, a fair cross section violation. *See Duren,* 439 U.S. at 362, 366–67, 99 S.Ct. at 667 (finding that a prima facie case of a fair cross section violation had been established when the evidence presented demonstrated a 39.5 percent underrepresentation); *Hawkins,* 661 F.2d at 442 (holding that a 5.45 percent underrepresentation "fall[s] well within the limits set forth by the Supreme Court and in this Circuit").

## B. Equal Protection Violation

### 1. Legal Framework

■ In order to make out the prima facie case of racial discrimination necessary to demonstrate an equal protection violation, the defendant must show that he is a member of a racial group capable of being singled out for differential treatment and that the government has purposefully discriminated against his racial group in the jury selection process. *See Batson v. Kentucky,* 476 U.S. 79, 94–95, 106 S.Ct. 1712, 1721–22, 90 L.Ed.2d 69 (1986); *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26; *Castaneda v. Partida,* 430 U.S. 482, 493–95, 97 S.Ct. 1272, 1279–81, 51 L.Ed.2d 498 (1977). Purposeful discrimination can be shown by proving that "in the particular jurisdiction members of [the defendant's] race have not been summoned for jury service over an extended period of time." *Batson,* 476 U.S. at 94, 106 S.Ct. at 1721. Because the issue is purposeful discrimination, however, a showing of absolute exclusion is not the only means by which a prima facie case can be established. Instead,

Defendant may show that "members of [his] race were substantially underrepresented on the venire from which his jury was drawn, and that the venire was selected under a practice providing 'the opportunity for discrimination.'" *Id.* at 95, 106 S.Ct. at 1722 (quoting *Whitus v. Georgia,* 385 U.S. 545, 552, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1967)); *see also Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280. Thus, the difference between a fair cross section violation and an equal protection violation is that with the former, the systematic underrepresentation, if sufficiently significant, proves the violation, whereas for the latter, the substantial underrepresentation, whether systematic or not, must have been caused by purposeful discrimination in order for a violation to be demonstrated.

> Once a prima facie case has been made, the burden shifts to the State to explain adequately the racial exclusion.... The State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties.... Rather, the State must demonstrate that "permissible racially neutral selection criteria and procedures have produced the monochromatic result."

*Batson,* 476 U.S. at 94, 106 S.Ct. at 1721 (quoting *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972)).

### 2. Analysis

■ Again, Defendant has satisfied the initial requirement for proving an equal protection violation: he is an African–American, and African–Americans constitute a cognizable group for equal protection purposes. Clearly, however, African–Americans have not been systematically excluded from jury service in the Fort Worth division. Of the qualified jurors summoned for service in the thirteen months prior to the selection of Defendant's panel, 7.66 percent were African–

the 1990 census, indicates that 10.4103 percent of the gross population of the Fort Worth division are African–Americans, the Court questions whether the ten percent figure gleaned from the Administrative Office's sampling can be used to accurately estimate the actual number of qualified African–American jurors in the division. The Court expects that the difference between

the gross population of *any* racial group in the division and those who are actually qualified to serve as jurors would be much greater than .4103 percent. Nevertheless, due to the Court's finding, *infra,* that no fair cross section violation has been shown even if the ten percent figure is accurate, further examination into the figures presented by Defendant is unnecessary.

American. Indeed, Defendant's petit jury contained two African–American members. Nevertheless, Defendant has attempted to demonstrate purposeful discrimination by arguing that African–Americans were substantially underrepresented on his venire, and that the system by which his venire was selected provided an opportunity for discrimination.[6] In that regard, Defendant presented evidence that approximately three percent of his venire were African–American, which constitutes, Defendant argues, a substantial underrepresentation. Additionally, Defendant attempted to show that the Northern District of Texas's jury selection system, as implemented by the Fort Worth division's jury clerk, provided the opportunity for discrimination.

 Initially, the Court finds that Defendant has failed to show that African–Americans were substantially underrepresented on his venire panel. As previously indicated, the evidence presented at the hearing indicates that approximately 10.41 percent of persons in the Fort Worth division are African–American.[7] Approximately three percent of Defendant's venire were African–Americans, resulting in an underrepresentation of African–Americans by approximately 7.41 percent. The Court finds that a seven percent underrepresentation is insufficient to constitute the *substantial* underrepresentation required to demonstrate, prima facie, an equal protection violation. *See Castaneda,* 430 U.S. at 495, 97 S.Ct. at 1280 (finding that a forty percent differential between Hispanic–Americans in the gross population and Hispanic–Americans summoned for jury service constituted a substantial underrepresentation for purposes of a prima facie equal

protection claim); *Alexander,* 405 U.S. at 629–30, 92 S.Ct. at 1224–25 (sixteen percent differential between number of blacks in gross population and number of blacks on the defendant's venire, coupled with fact that jury selection procedures were not racially neutral, established prima facie case); *Turner v. Fouche,* 396 U.S. 346, 359–61, 90 S.Ct. 532, 539–41, 24 L.Ed.2d 567 (1970) (twenty-three percent underrepresentation was substantial); *Swain v. Alabama,* 380 U.S. 202, 208–09, 85 S.Ct. 824, 829–30, 13 L.Ed.2d 759 (1965) (ten percent underrepresentation was insufficient); *Thompson v. Sheppard,* 490 F.2d 830, 832–33 (5th Cir.) (recomposition of jury lists not required when there was an eleven percent disparity between the percentage of African–Americans in the total population and the percentage of African–Americans on the jury list), *cert. denied,* 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1974).

 The Court recognizes, however, that the degree of underrepresentation is not the end of the inquiry, as a lesser degree of underrepresentation might nevertheless be sufficient for purposes of showing an equal protection prima facie case if an opportunity for discrimination existed in the operation of the jury selection system. *See Alexander,* 405 U.S. at 630, 92 S.Ct. at 1225; *Blackburn,* 639 F.2d at 1122–1123. Thus, a significant opportunity for discrimination, combined with a seemingly less-conspicuous degree of under-representation, might be adequate to shift the burden to the government to come forward with racially neutral reasons for the perceived discrimination. Defendant has therefore attempted to prove that the jury

---

**6.** At the hearing, Defendant presented evidence that African–Americans are typically distrustful and fearful of the judicial system, and as a result, would be more likely than members of other races to ignore a summons for jury service. Although such a showing might be relevant to show a systemic failure to obtain the service of African–Americans for purposes of a fair cross section analysis, it rebuts rather than supports Defendant's showing of purposeful discrimination in the equal protection context, as it indicates that any underrepresentation might result, at least in part, from African–Americans' distrust for the system rather than from the State's purposeful discrimination.

**7.** Some have argued that, as in claims of fair cross section violations, analysis of alleged equal protection violations in the jury selection process should depend upon *eligible* population statistics rather than gross population statistics. *See United States ex rel. Barksdale v. Blackburn,* 639 F.2d 1115, 1123 (5th Cir.), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981). In this case, however, the evidence presents a variation of only .4103 percent between the eligible and gross population figures, so utilization of either figure would result in approximately the same statistical disparity.

selection procedures used to select venires in the Fort Worth division are subject to such an opportunity for discrimination.

To support his argument, Defendant indicated in his motion to dismiss that the jury clerk compensated for an unanticipated shortage in the numbers of persons present to serve on Defendant's venire by telephoning, in a non-random manner, persons who were selected to serve on the previous month's panel and requesting that they serve on Defendant's venire. No evidence was adduced at the hearing on Defendant's motion, however, to support this contention. Instead, Defendant attempted to prove that the opportunity for discrimination existed because, prior to the actual commencement of voir dire, the jury clerk telephoned some of the persons randomly selected to serve on Defendant's venire who failed to appear as summoned.[8] Four of the persons who were telephoned subsequently appeared for service and were included in Defendant's venire.[9] To demonstrate that this resulted in, or at least could have resulted in, discrimination against African–Americans, Defendant presented evidence that African–Americans are generally more difficult to reach by telephone during the day than members of other races, as they are more likely to work at labor-intensive jobs where it is difficult to reach them via telephone. Because they are less likely to be reached by telephone during the day, and because the jury clerk made her telephone calls during normal working hours, Defendant argues that discrimination, or at least the opportunity therefor, existed. Additionally, although not expressly argued by Defendant, because the jury clerk had information at her disposal from which the race of those persons summoned for service could be ascertained,[10] one could argue that the requisite opportunity for discrimination was present. Since the clerk possessed information showing the jurors' races, she could have determined, if she was of a mind to discriminate, which persons who failed to appear as summoned were African–American and then waited until *after* voir dire commenced the following day to telephone them.

Nevertheless, the Court is unpersuaded that Defendant has shown a significant opportunity for discrimination. That unpersuasiveness, coupled with the insubstantial degree of underrepresentation, compels the Court to find that Defendant has failed to demonstrate, prima facie, an equal protection violation. Even assuming such a case has been demonstrated, however, the Court finds that it has been rebutted, as the evidence presented shows that no discrimination occurred in the selection of Defendant's venire. Specifically, one of the four persons who failed to appear on April 5th and was telephoned by the clerk, and who subsequently appeared on the 6th for service, is African–

8. The jury clerk testified that, in accordance with directions from the Fort Worth division's judges, she always telephones those persons who fail to appear as summoned in an attempt to ascertain why they failed to appear. She began making such phone calls for Defendant's panel on the day that the panel members were scheduled to appear for jury selection, which was Monday, April 5, 1993, but did not complete her telephone attempts until approximately April 7, 1993.

9. As indicated, the panel members were originally scheduled to appear on April 5th. Because of unforeseen difficulties, including entertainment of the defense's oral motion to strike the panel, the panel was dismissed until the following day. Thus, voir dire did not actually commence until the morning of April 6th, and the four belated individuals were included on Defendant's venire panel prior to the commencement of voir dire.

Some confusion exists regarding exactly how many of the telephoned jurors appeared for service on the 6th. At the September 1st hearing, the jury clerk testified that 147 persons appeared as summoned on April 5th, thirteen of whom were excused from service that day. She further recalled that, as a result of her telephone calls to some of the jurors who failed to appear on the 5th as summoned, five more jurors showed up for service on the 6th, making a total panel of 139 at the commencement of voir dire on the 6th. It appears, however, that the clerk's recollection on this point was somewhat inaccurate, as Defendant's Exhibit H, which consists of the clerk's jury list from April 5th and 6th, reflects that twelve jurors were excused on the 5th, and only four jurors who failed to appear on the 5th showed up for service on the 6th. The records indicate that the four belated jurors were Ronald Michae(l) Sanders, Mark Alan Burris, J.C. Jenkins, and Richard Glenn Duty. Regardless, the final size of the venire panel on April 6th was 139.

10. See *infra* note 12 and accompanying text.

American.[11] Thus, even if Defendant has shown that an opportunity for discrimination existed, the fact that 25% of the persons who appeared as a result of the clerk's allegedly discriminatory telephone calls are of Defendant's race rebuts Defendant's showing. Additionally, to place the allegedly suspect calls, the clerk testified that she obtained the missing jurors' telephone numbers from the information sheet they detach from the summons form and return to the clerk's office after being summoned, which does not reflect the race of the person summoned.[12] She further testified that she "went right down the list" and attempted to call all persons for whom a telephone number was given. The Court finds the clerk's testimony credible and further finds that she had no intention of discriminating against any race when she engaged in the questioned methods.

■ Thus, to the extent that Defendant has presented a prima facie case of purposeful discrimination based upon the clerk's allegedly inappropriate telephone calls, the Court finds that it has been rebutted. As Defendant failed to come forward with any other evidence of discrimination at the hearing, and after considering the jury selection plan for the Northern District of Texas, as implemented by this Court's jury clerk, the Court finds that the seven percent underrepresentation of African–Americans on Defendant's venire was the result of "racially neutral selection criteria and procedures." *Alexander*, 405 U.S. at 632, 92 S.Ct. at 1226.

## II. ALLEGED STATUTORY VIOLATION

Defendant further argues that the jury clerk's actions violated this Court's Jury Plan ("the Plan") and the Jury Selection and Service Act of 1968 ("the Act"). *See* 18 U.S.C.A. §§ 1861–78 (West. 1966 & Supp.1993). As with his constitutional arguments, Defendant attacks the jury clerk's telephone calls to jurors who failed to appear for service as summoned on April 5th.[13] After careful consideration of the evidence presented at the hearing, the Court finds that any violation, if shown, was of a technical nature and did not

---

**11.** The Court recalls, and the clerk's records, which were admitted as Defendant's Exhibit J, reflect, that J.C. Jenkins is African–American.

**12.** The only form used by the clerk that indicates a juror's race is the 'Juror Qualification Questionnaire,' which is mailed out to all prospective jurors when a list of qualified jurors is being compiled from the master jury list. *See* Defendant's Exhibit J; *see also* 28 U.S.C.A. § 1864(a) (West.Supp.1993). The questionnaire is then completed by the prospective juror and returned to the clerk. The qualified juror list consists of all persons who returned the questionnaire and were not found, based upon their responses to the questionnaire, to be exempt. A certain number of persons, as ordered by the 'duty judge,' are randomly selected each month from the list of qualified jurors to serve as petit jurors for the following month. *See* Defendant's Exhibit D. Summons forms are then issued for those jurors. The summons form contains a perforated section that requests various information, such as home and work telephone numbers, about the summoned juror. The juror is directed to complete the information section, detach at the perforation, and remit that section of the summons to the Fort Worth division jury clerk. It is from this perforated information section of the summons form, which does not indicate the juror's race, that the Fort Worth division jury clerk obtained the telephone numbers of the jurors who failed to appear to serve on Defendant's venire panel.

**13.** Also similarly to his constitutional arguments, Defendant's motion argues that the jury clerk telephoned persons from previous panels and requested that they serve on Defendant's venire panel. As previously indicated, the evidence presented at the hearing does not support this contention. However, the petit jury panel ordered to be drawn for the month of April, *see* Defendant's Exhibit D, was apparently supplemented with the names of qualified jurors who had been postponed from previous month's panels. *See* Order Denying Motion for Leave to File Supplemental Memorandum, filed September 20, 1993. Nevertheless, such a procedure is specifically sanctioned by both the Act and the Plan. *See* 28 U.S.C.A. § 1866(c)(1) (West.Supp.1993); Jury Plan for the United States District Court for the Northern District of Texas, page 10, paragraph 12(A) (admitted as Defendant's Exhibit E); *see also United States v. Kennedy*, 548 F.2d 608, 612 n. 6 (5th Cir.) (noting § 1866(c)(1)'s requirement that postponed jurors be used as soon as the reason for their postponement dissipates, and indicating, in rejecting the use of "volunteer" jurors, "that the Act and its random selection policy leave no room for the additional operation of personal preference on the part of those whose names are drawn for jury service"), *cert. denied*, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977).

jeopardize the goals which the Act is designed to achieve. *See id.* §§ 1861–62.

■ Initially, the Court notes that Defendant's attempt to present evidence at the hearing regarding deviations from the Act not raised in the sworn memorandum initially filed with his motion to dismiss was improper, and such evidence is subject to being stricken.[14] The purpose of the requirement of the sworn memorandum is to put all parties and the Court on notice of Defendant's claims, and to assist the Court in determining whether an evidentiary hearing is required. *See United States v. Bearden,* 659 F.2d 590, 597 (5th Cir.1981), *cert. denied,* 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). At the hearing, Defendant basically argued that the clerk had "changed her story," and that he had not discovered prior to the hearing the facts underlying the allegedly improper telephone calls to jurors who failed to obey the summons for service on his venire panel. In such a situation, however, the question becomes whether the defendant has acted in a diligent manner. *See id.* The Court previously found in its September 20, 1993 order that Defendant had been dilatory in his attempts to uncover the true nature of any alleged discrepancy between the clerk's methods and the Act's provisions. Nevertheless, in determining whether a substantial violation of the Act has been proven, the Court, in what it believes to be an abundance of caution, will consider the alleged deviation Defendant exploited at the hearing. *See id.* at 598.

■ In order to establish a statutory violation, Defendant must show that the government substantially failed to comply with the methods set forth in the statute for selection of the venire panel. *See id.* § 1867(a); *Bearden,* 659 F.2d at 600. The Fifth Circuit has held that

[d]etermining the substantial compliance question requires that the alleged violations of the Act be weighed against the goals of the statute.... The major policy

of the Act is that juries shall be 'selected at random from a fair cross section of the community.' 28 U.S.C. § 1861. Discrimination is prohibited in the selection process.

*United States v. Davis,* 546 F.2d 583, 589 (5th Cir.), *cert. denied,* 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). "Otherwise technical violations of the statute constitute 'substantial failure to comply' when they affect the random nature or objectivity of the selection process." *Kennedy,* 548 F.2d at 612. In order to prevail on this issue, however, Defendant need not show actual prejudice:

[W]hen a statutory violation directly affects the random nature of the selection process, there is no need to show that the violation tended to exclude some cognizable group from that process. Congress did not simply outlaw certain disparities in representation of certain groups on juries; it designed a procedure of random selection to ensure that no such disparities would arise. A departure from the statutory scheme that directly affects the random nature of selection establishes a substantial violation independently of the departure's consequences in a particular case.

*Id.* at 612.

■ In support of his argument that the clerk's telephone calls constituted substantial noncompliance, at the conclusion of the September 1st hearing, Defendant's counsel directed the Court's attention to § 1864(b), which provides that "[a]ny person summoned pursuant to subsection (a) of this section who fails to appear as directed shall be ordered by the district court forthwith to appear and show cause for his failure to comply with the summons." 28 U.S.C.A. § 1864(b) (West. Supp.1993). Subparagraph (a) of that provision, however, provides for the issuance of summonses to persons drawn from the master jury wheel who do not complete and return juror qualification forms to the clerk

14. Indeed, at the hearing, counsel for the government raised the issue of the propriety of Defendant's attempts to elicit evidence that was outside the scope of his August 13th sworn memorandum. The Court construed the government's

objections as a motion to strike, which was taken under advisement. Because of the Court's decision to nevertheless consider the points raised at the hearing, the government's motion to strike, although proper, is denied.

of the Court in a timely manner. *See id.* § 1864(a); *see also supra* note 12. In this case, the jurors telephoned by the jury clerk had already completed and returned their juror qualification forms, were qualified as jurors, and, although summoned for service on Defendant's venire, failed to appear. Section 1864 is not applicable to the failure of qualified veniremen to appear as summoned.

[redacted] The Court believes that § 1866(g) is the statutory provision that Defendant's counsel meant to emphasize. Section 1866(g) regulates the action to be taken in the event that a qualified juror fails to comply with a summons directing him to appear for jury service. Specifically, that subparagraph provides that

> [a]ny person summoned for jury service who fails to appear as directed shall be ordered by the district court to appear forthwith and show cause for his failure to comply with the summons. Any person who fails to show good cause for noncompliance with a summons may be fined not more than $100 or imprisoned not more than three days, or both.

28 U.S.C.A. § 1866(g) (West.Supp.1993). The question, then, is whether the jury clerk's telephone calls to the jurors who failed to appear on April 5th constituted a substantial violation of § 1866(g). The Court finds that, although the jury clerk's actions, which were based upon long-standing practice in the division as requested by the division's judges, may have constituted a technical violation of § 1866(g),[15] it did not constitute a 'substantial failure to comply,' as her phone calls did not directly "affect the random nature or objectivity of the selection process." *Kennedy,* 548 F.2d at 612.

There is no question that such telephone calls by the clerk do not affect the random nature of the selection process in most cases, as voir dire normally commences within hours after the jurors are supposed to appear. Thus, as a general rule, jury selection begins before any nonappearing juror is telephoned by the clerk and afforded a second opportunity to appear. The dispute in this case results from the fact that voir dire did not commence until after four jurors telephoned by the clerk appeared for service. Even so, however, the Court does not accept the contention that because the clerk, who was concerned that a sufficient number of jurors appear for service, telephoned nonappearing jurors who had already been *properly* and *randomly* selected for Defendant's venire, the objectivity of the selection process was frustrated. *Cf. Shelton v. Jones,* 272 F.Supp. 139 (W.D.Va.1967) (new trial not required where, due to emergency need for jurors, clerk telephoned persons randomly drawn from jury box instead of mailing summons).

## *III. CONCLUSION*

The Court finds that Defendant has failed to establish a prima facie case of a fair cross section violation. Likewise, the Court finds that Defendant has failed to demonstrate the elements of a prima facie equal protection violation, and, to the extent that Defendant has made such a showing, the evidence proves that no equal protection violation occurred. Finally, the Court finds that the jury clerk substantially complied with the Jury Plan for the Northern District of Texas and the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–78. For all of the foregoing reasons, the Court finds that Defendant's motion to dismiss the indictment should be and is hereby DENIED.

SO ORDERED.

[redacted]

15. The Court is not convinced that the clerk's actions constitute even a technical violation. The clerk testified that, pursuant to a request akin to a "standing order" of the Fort Worth division district judges, her policy is to always attempt to contact recalcitrant jurors and ascertain the reasons for their failure to obey the summons, which she then presumedly reports to the district judges, who then decide whether any further action should be taken. Thus, the district judges have essentially ordered the recalcitrant jurors to 'appear' via telephone before the court's clerk and give the reason for their disobedience of the summons. Although the Court agrees that the procedure used may have a lesser impact on the recalcitrant juror than the procedure contemplated by § 1866(g), the Court does not agree that the procedure used violates the statutory provision.