29 A.3d 696

Lakisa DINKINS, Individually, et al.

v.

Charles GRIMES, et al.

No. 2829, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Sept. 30, 2011.

Allan B. Rabineau & A. Dwight Pettit (Ronisha A. Moore, on the brief), Baltimore, MD, for Appellant.

William P. Phelan, Jr. (George A. Nilson, City Solicitor, on the brief), Baltimore, MD, for Appellee.

Panel: ZARNOCH, WATTS, and JAMES P. SALMON, (Retired, Specially Assigned), JJ.

ZARNOCH, J.

Against the backdrop of a controversial arrest in 2007 by Baltimore City Police of a 7–year old on a dirt bike, we are called upon to examine judicial decisions that led to an order and confirmation of an out-of-city removal and transfer and ultimately, a rejection of damages by a jury in the Circuit Court for Howard County. Among the hot-button issues in this highly-charged case are: 1) whether a removal and a transfer were justified on the basis of pervasive community prejudice, including widespread prejudicial publicity; 2) whether due process required appellants to be heard in the transferor court on the designation of a new venue; and 3) whether equal protection required the case to be transferred to a jurisdiction with racial demographics similar to those of

Baltimore City.[1] For reasons set forth below, we answer these questions in appellees' favor and uphold the decisions below.[2]

## FACTS AND PROCEEDINGS

Not particularly helpful in resolving this appeal are the facts supporting non-liability as found by a jury in Howard County. Rather, more critical are appellants' pre-trial allegations and the public reaction before and at the time the transfer decisions were made. These allegations focused on police encounters on March 13, 2007 and March 24, 2007.

### I. The Allegations

On the afternoon of March 13, 2007, 7–year–old Gerard Mungo, Jr. ("Gerard") was sitting on a Yamaha TT–R50 Mini Bike ("dirt bike") outside his home on the 2100 block of East Federal Street in Baltimore City. Although the vehicle was turned off, it was not "securely locked or otherwise immobilized" as required by the Baltimore City Code.[3] After observ-

---

1. Appellants have framed the questions presented in the following fashion:

    1. Did the Court abuse its discretion in removing the case from Baltimore City?
    2. Were Plaintiffs denied due process of law guaranteed by the 14th Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights by the procedures provided for the removal of a case pursuant to Maryland Rule 2–505?

2. Appellants in this case are Lakisa Dinkins, individually, and as Next Friend of Gerard Mungo, Jr. and of Devon Johnson, minors at the time the cause of action arose. Appellees are the Baltimore City Police Department and six of its officers: Charles Grimes; Donald Hayes, William Colburn, IV; Calvin Moss; Jermaine Cook; and Gene Bennett. Another alleged member of the City Police Department, "Officer Wilson," was named in the complaint, but no one was ever able to figure out who Wilson was and he was eventually dismissed from the case without objection by appellants. Thus, he is not a party to this appeal.

3. Article 19, § 40–6 of the Baltimore City Code (2007, 2008 Supp.) provides:

    (a) No person may drive or ride any dirt bike or any unregistered motorcycle or similar vehicle on any public or private property that is

ing Gerard, Baltimore City Police Officer Charles Grimes and Officer–Trainee Brian Chris approached the child and confiscated the dirt bike. Officer Donald Hayes arrived at the scene and the dirt bike was placed in the back of his police truck. According to the complaint filed in this case, these officers (among others) "maliciously and unreasonably grabbed Gerard by his shirt collar and dragged him off the bike."

At this time, Lakisa Dinkins, Gerard's mother, confronted the officers and informed them that she planned to make a complaint to their supervisor. Officer Grimes called his supervisor, Sergeant William Colburn, IV, to inform Colburn of Dinkins' intentions. Subsequently, Dinkins called 311 to make a formal complaint about the conduct of Officer Grimes, Officer Hayes, and Officer–Trainee Chris. Before responding to the scene, Sgt. Colburn called the State's Attorney's office regarding the legality of arresting Gerard. Later, Sgt. Colburn, along with Officer Grimes and Officer Hayes, returned to Dinkins' home. According to the complaint, the officers yelled at, taunted and bullied Gerard and followed the frightened child into his house. The officers then arrested Gerard handcuffed him, and placed him in the back of a police car. The child was then transported to the Eastern District Police Station for processing and fingerprinting. According to the complaint, he was chained to a bench for hours, interrogated and detained without his parents' consent. In addition, one officer was alleged to have said to Gerard: "If it weren't for your mother calling my boss, you wouldn't have went to jail." The child was later released and never formally charged.

---

located in Baltimore City or, wherever located, that is owned or regulated by the City.

(b) No person may own, control, possess, or have custody of any dirt bike or any unregistered motorcycle or similar vehicle in Baltimore City unless the vehicle is securely locked or otherwise immobilized by a wheel clamp or other object, device, method, or mechanism, whether attached to the vehicle or not, that:

(1) prevents the vehicle from being freely moved; and

(2) cannot be removed or deactivated without the assistance of the vehicle's owner.

The dust had barely settled on the dirt bike arrest when the City police again encountered Dinkins and her family. Eleven days later, Officer Jermaine Cook, Detective Gene Bennett and Officer Calvin Moss were in an unmarked vehicle investigating illegal drug activity. Believing they had observed an unlawful drug transaction involving one Ernest Thompson, they confronted Thompson, who allegedly ran into a dwelling on the 2200 block of Prentiss Place. The house was owned by Dinkins' sister.

According to appellants' complaint, Officers Moss, Cook and Bennett "barged" into the house. The complaint continued:

> After barging into the house, Defendants Cook, Moss and/or Bennett maliciously and unreasonably held a gun to the head of Ms. Dinkins' fourteen (14) year-old-son, Devon Johnson, telling him to get off of the telephone. . . .

> Aware that Ms. Dinkins was the mother of the seven-year-old who was arrested for sitting on a dirt bike, an individual who had publicly criticized officers of the BCPD for their treatment of Gerard, Defendant Cook, Bennett and/or Moss unreasonably and maliciously grabbed Ms. Dinkins by the back of her jacket, shoved her into a chair and arrested her for allegedly hindering an arrest even though no other person at the scene was arrested.

> Thereafter, Ms. Dinkins was unreasonably and maliciously taken against her will by Defendants Cook, Bennett and/or Moss to the Baltimore Central Booking and Intake Facility where she was forced to be imprisoned and detained in deplorable conditions for several hours before being released. When Ms. Dinkins was ultimately released from the Central Booking Facility, she was released without being advised as to what she had been charged with, she was never presented with any charging documents and she was never required to stand criminal charges for the incident of March 24, 2007.[4]

---

4. A "supplement" to the Statement of Probable Cause signed by Officer Moss told a different story:

## II.  Public / Media Reaction

By March 15, 2007, the story reached the media that police had pulled Gerard by the collar and dragged him off the dirt bike, yelled at the frightened child, handcuffed him and placed him under arrest.[5]  The next day the newspaper and television stations reported that Mayor Sheila Dixon criticized the officers' actions.  She was quoted as saying: "It is clear to me that the arrest was wrong, that the officers on the scene should not have arrested the child, and on behalf of the City of Baltimore, I apologize to the boy and his parents."  Police Commissioner Leonard Hamm promised an internal investigation.  Local politicians echoed their dismay and the President of the Baltimore Chapter of the NAACP said his membership

---

Ms. Lakisa Dinkins, began yelling.  Ms. Dinkins demanded that Officer Cook and I leave the dwelling.  She repeatedly shouted that we had no warrant and had to leave.  As I attempted to diffuse the situation … Ms. Dinkins repeatedly yelled, "Don't listen to this white mother f[* *]ker."  I repeatedly asked for everyone to calm down so that I could explain the situation.  Officer Cook and I were conducting our investigation.  Ms. Dinkins repeatedly approached both myself and Officer Cook, while yelling and shouting.  Ms. Dinkins was very aggressive and was waving her arms as she shouted and paced around the room.  Several times, Ms. Dinkins stated that we had to go and implored the others in the room to "make them leave, they don't have a warrant."  In response to Ms. Dinkins' yelling, the four males and two other females erupted and began yelling and being uncooperative.  To protect Officer Cook and myself, I ordered Ms. Dinkins to be seated and to quiet herself.  Ms. Dinkins refused to comply and stated, "I ain't listening to no white mother f[* *]ker."  As she approached me, due to Ms. Dinkins actions and her incitement of the others present, I was forced to call for a marked unit to assist us.  I again told Ms. Dinkins to be seated and to be quiet and informed her that she was hindering our investigation and would be arrested if she continued.  Again Ms. Dinkins stated, "Take me to jail, I ain't listening to no white mother f[* *]ker."

I then informed Ms. Dinkins that she was under arrest and reached for her left arm to place her in handcuffs.  At that time, Ms. Dinkins pulled from my grasp in a violent manner and sat down on a chair while stating, "You ain't touching me you white mother f[* *]ker."  Not wishing for a physical confrontation with Ms. Dinkins, I allowed her to stay seated until our investigation was completed.  At that time, I again informed her that she was under arrest.  Ms. Dinkins was handcuffed and transported for processing.

5.  Television stations carried images of the dirt bike.

was angered by the arrest.[6] Dinkins was reported as saying that the arrest had "changed [Gerard's] life ... he'll never be the same."

On March 19, 2007, a demonstration took place outside City Hall in a "call for justice" for Gerard. According to the *Examiner* newspaper, the leader of the protest sought a personal apology by the Mayor and Police Chief and the firing of the officer who arrested the boy because the arrest was "a violation of the boy's civil rights." He added that "[t]he officer is back in the community, which is an intimidation factor toward the young man and his family." [7] News coverage of the protest continued the next day, reporting a church leader as saying: "Gerard is a symbol for broader problems, and the situation is an indication of an ongoing problem in the black community." A story in the *Examiner* on the City crime rate made a reference to Gerard and letters to the editor in the same publication said that the correspondents were "disgust[ed]" and "incense[d]" at the police actions.

On March 21, *Baltimore Sun* columnist, Gregg Kane wrote: "If there were a Richter scale that measured outrage, this incident would have blown the needle off the thing." Kane said: "The arrest was reserved for the 7–year–old black kid from a poor East Baltimore neighborhood. As Dixon and Hamm have said, there's really no way to justify that."

Four days later, news media reported Dinkins' March 24 arrest and recounted her claim that the police retaliated against her for protesting the arrest of her son. In one account, the local NAACP reiterated that Dinkins' arrest "was retaliation for Dinkins taking her objections to her son's arrest public." In an *Examiner* story, the organization's head reportedly said: "If they want war, they'll have war." A March 26, 2007 *Baltimore* Sun article noted that Gerard's arrest had

---

**6.** Some of the officers involved in the arrests were white and others, like Dinkins and her family, were African–American.

**7.** The *Examiner* ran a critical editorial the same day. Its website collected earlier news stories on the arrest under the caption: "Read all about Gerard's ordeal."

"attracted national attention" and reported the details of the March 24 encounter, including allegations that an officer held a gun to Devon's head. The next day, the Baltimore branch president of the NAACP called for an emergency meeting with the Mayor on the arrest of Dinkins and Gerard. He called the arrest of Gerard "our Rosa Parker incident." On March 27, Rev. Anthony Evans, the head of the *National Black Church Initiative,* an African–American religious organization, called for a "boycott of Baltimore" by all religious conventions to protest the child's arrest. The following day, the *Examiner* reported that at a NAACP meeting, a community activist said to Commissioner Hamm: "How can these officers still have badges after arresting a child? They are thugs in uniforms." WJZ–TV reported without attribution that the City State's Attorney "personally reviewed the case [against Dinkins] and called it legally insufficient, fueling claims by the family that the arrest was retaliation [for] the embarrassing arrest of a seven year old." The arrest also became an issue in Annapolis, where State legislators slowed progress on a police arbitration bill because of the incident.

News coverage continued in April. An April 4, 2007 *Examiner* story reported on dueling protests outside Eastern District police headquarters: one group supporting Gerard; the other supporting the police. One community leader is reported to have said: "Until Commissioner Hamm has the badges of the officers that arrested Gerard, he has no credibility." An April 12 "commentary" in the *Examiner* on Commissioner Hamm said of Gerard's arrest: "On the surface, police behavior seems totally unacceptable, with leadership to blame. Media picked up the story, broken by *The Examiner,* spreading it like wildfire around the state, county and world." On April 21, news media reported the release of a police report on Gerard. It recommended a comprehensive review of police policies and procedures on the arrest of young juveniles, but was met with angry criticism by Dinkins and community leaders.

Coverage of the incidents appeared to diminish with Gerard's arrest mentioned only in a number of stories primarily

concerned with other topics (such as the resignation of the Police Commissioner). However, the filing of the lawsuit against the officers in November of 2007 stirred up a new round of media attention.[8]

As the litigation progressed in relative quietude, time did not erase the controversy in the eyes of the media. A March 17, 2008 *Examiner* story recounted the history of the case under the headline: "A year later, child bears scars of arrest for sitting on dirt bike," and quoted Dinkins as saying: "[P]eople said, 'I saw you on TV.' It happens all the time." A *Wikipedia* entry on the Baltimore City Police Department recounted the circumstances surrounding the arrests of Gerard and Dinkins.

### III. Appellees' Removal Motions

In June of 2008, appellees filed a motion for removal, arguing that "[g]iven the pervasive, protracted and totally one-sided portrayal of the 'facts,' as well as the hostile public reaction and protests, it is not possible for the police officers to receive a fair trial in Baltimore." Attached to this motion were exhibits of media coverage of the events in the case [9] and an affidavit of Officer Hayes,[10] which stated that based on news accounts, "I believe that neither I, nor any of the defendants in this case, can receive a fair and impartial trial in Baltimore City." [11]

---

**8.** The Complaint and Demand for a Jury Trial, among other things, asserted two counts of violations of the Maryland Declaration of Rights, two counts of false arrest, two counts of false imprisonment, two counts of battery, and two counts of assault. Each count sought $3 million in compensatory damages and $5 million in punitive damages. Appellees filed an answer essentially denying the allegations.

**9.** Appellees' counsel later said at argument in the circuit court that there were "1340 hits" on the Internet discussing the case, "all of it negative, all of it prejudicial."

**10.** Later, in support of the officers' motion, appellees' counsel argued that a "different jurisdiction" would satisfy the officers—"Baltimore County, hypothetically, would even be sufficient."

**11.** None of the other officers filed a separate affidavit, an omission not challenged by appellants.

In opposition to the motion, Dinkins argued that the defendants had not satisfied the "heavy burden" required to justify removal and asserted:

If this Court were to grant Defendants' Motion for Removal, the Court would be setting a gross precedent to allow for the removal of each and every high-profile case in Baltimore City where the media coverage was asserted to be more favorable to the prosecution, defendant or plaintiff notwithstanding the absence of any proof that the *voir dire* process can not function to secure a fair and impartial trial. . . . [12]

On June 28, 2008, Judge M. Brooke Murdock heard argument on the motion and announced her ruling:

Well, I must admit that this is a tough one, because while I agree generally with Mr. Trager that . . . there are adequate measures in place to safeguard Voir Dire being [one], I'm very troubled by the fact that the Chief Executive of this jurisdiction, made—makes a public statement in a case which clearly was headed towards litigation.

My problem is, is that if I say—if I grant the Motion for Removal, it appears—it seems to me that what I'm saying is that the Baltimore City jury can't be fair in this case, that there's reasonable grounds to believe that they can't—that the police officers won't receive a fair trial from a Baltimore City jury.

And I just don't believe that. I believe we're strongly in the jury system.

Like Mr. Trager, I've seen juries sort through all kinds of complicated high publicity cases and come to the—what this Court viewed was the correct decision.

So, for those reasons, I am going to deny the Motion for Removal. I believe that there are adequate measures that exist to guard against the exposure to the pretrial—this really serious pretrial publicity.

---

12. Attached to appellants' response were various exhibits, including transcripts of Dinkins' 311 call to City Police and of police radio communications about Gerard's arrest.

And if it turns out during voir dire—because I'm hoping this case comes back to me, because it looks like it'll be an interesting case—if it turns out that during Voir Dire there are many, many people who say they know about the case, and that they can't be fair, I may be proven wrong.

But I suspect that most citizens in Baltimore City, in these days of computers haven't read, or if they have read, they have forgotten whatever they've read sufficiently, so that they can be a fair juror.

So I will deny the Motion for Removal, and I'll issue a written order to that effect.

Judge Murdock's June 28 ruling did not put out the fire on either the transfer issue or publicity about the case. The transcripts attached to appellees' response found their way into the hands of local television stations and other media. On July 30 and 31, stories appeared asserting that one of the appellees and a dispatcher joked about arresting Gerard.[13] Some of the reports recounted earlier unflattering accounts of the police encounters and the retaliation charges.

The publicity spurred appellees, on August 7, 2008, to file a Motion for Reconsideration of the Defendants' Motion for Removal. The motion said of the new burst of media attention:

The article was highly prejudicial and demonstrates the kind of publicity that any Baltimore City Jury will be exposed to during the prolonged trial of this case. Based upon the extensive publicity this case has received and Plaintiff's continuous and successful efforts to garner emotional and prejudicial publicity adverse to the defendants, a fair trial can not be obtained.

---

**13.** A July 31 *Examiner* article contained the following exchanges:
"He's getting locked up," Colburn said.
"Good," the dispatcher responded.
Colburn then told the dispatcher he will go the scene to "handcuff the kid." The dispatcher then started to laugh.
Documents produced by the defense also indicate that Sgt. Colburn and Officer Hayes made "some type of a bet as to whether or not they could lock up a 7–year–old," according to court records.

Appellees requested reconsideration of its prior motion and transfer of the case to "another county." [14] Appellants opposed the motion primarily on the basis of their earlier arguments on the initial motion for removal.

On September 23, 2008, another hearing was held before Judge Murdock, where the officers' counsel emphasized the "community resentment" present in the case, while appellants' lawyer noted:

[T]his case got a lot of publicity. It got national publicity. It got international publicity ... There's probably no place in the State of Maryland where this case could be removed to.

At the conclusion of the hearing, the court decided that removal was appropriate:

Due process requires that all parties receive a trial by an impartial trier of fact free from outside influences.

In the current matter, there [has] been ex[t]ensive, negative publicity alleged [to] have occurred, including but not limited to the 46 examples attached as exhibits to Defendant's motion.

Most of the publicity was critical to the Defendants, including statements alleged to have been made by high-ranking public officials.

There were demonstrations held in the city, demanding that the Defendants be terminated and prosecuted.

For these reasons, this Court believes that the moving parties have met the requirements of Maryland Rule 2[-]505, and it is reasonable to believe that Voir Dire will not provide adequate measures to permit an impartial trial in Baltimore City. And, therefore, it will grant the Motion for removal.

---

14. Appellees' memorandum accused appellants of placing "clearly irrelevant" transcripts "in furtherance of the persistent scheme to use the press to taint the jury pool." In their memorandum, appellants said that they "take issue with the Defendants' offensive accusations" and that "[t]he facts in this case ... speak for themselves."

Pursuant to the Rule, this Court will refer this matter to the Circuit Administrative Judge, to decide which County Circuit Court this matter should be sent.

The same day, Judge Murdock signed an order implementing her ruling and Administrative Judge Marcella A. Holland ordered the case transferred to the Circuit Court for Howard County.[15]

## IV. Appellants' Removal Motions

One of the first orders of business in the Howard County Circuit Court was the filing by appellants of a Motion for Removal, or in the Alternative, Motion for Transfer of Case Back to Baltimore City. The motion was accompanied by an affidavit signed by Dinkins stating her belief that "neither I, nor any of the Plaintiffs in this case, can receive a fair and impartial trial in Howard County."

The appellants' motion and memorandum argued that: 1) the transfer to Howard County did little to cure the alleged prejudicial publicity because that subdivision was served by the same media outlets as Baltimore City; 2) the jury pool in Howard County would not be representative of the jurisdiction from which the case was removed because Baltimore City's population was 65% African–American, while Howard County was 18% African–American;[16] 3) the true purpose of appellees' transfer was to find "a more racially favorable venue" in violation of federal and state constitutional requirements; 4) transfer of the case out of Baltimore pursuant to Md. Rule 2–505(b) violated due process because the rule does not "require a hearing nor does it require that the Administrative Judge

---

**15.** The latter order was not docketed until October 6, 2008.

**16.** Appellants later argued that their discrimination argument was supported by the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which held that equal protection was violated by the prosecution's use of race-based preemptory strikes of jurors. Their counsel also observed: "We would submit that there is only one other county that approaches on a statistical basis in African–American population comparable to Baltimore City, and that would be Prince George's County."

give a reason for the selection of the county to which the case is to be removed." [17]

Appellees opposed the transfer motion—contending that: 1) appellants' claim of racial discrimination was "pure conjecture and wholly unsupported by any fact"; [18] 2) they have not indicated that pre-trial publicity would impair their ability to obtain a fair trial; 3) the Maryland Rules did not permit a transferee court "to act as a quasi-appellate court and review the decision of the transferor court"; and 4) appellants should have requested that Administrative Judge Holland reconsider her decision to select the Howard County forum.

After an August 6, 2009 hearing, Judge Diane Leasure denied the appellant's motion. Specifically, she noted:

Well, obviously, what needs to be shown is that the parties in this case, the Plaintiffs are making the request, cannot receive a fair and impartial jury verdict in Howard County. And I just don't think that that's been shown.

The publicity issue can certainly be addressed as a more— we have high profile cases here too that get a lot of publicity, and more often than not, that's addressed adequately during the voir dire process where those kind of questions are asked, jurors are then, you know, questioned further as to their ability to be fair and impartial. I mean, that is part of the voir dire process.

So, on the basis of publicity alone, I don't believe the case should be removed further. As far as reviewing the decision of the judges in Baltimore City, both the, I guess the trial judge, Judge Murdoch, and the administrative judge— Circuit Administrative Judge, Judge Holland, clearly those decisions were made based upon what was presented to them.

---

**17.** At a hearing on their motion, appellants argued that this rule itself "does not comport with due process." This contention led Judge Leasure to observe: "Well, it may be an issue for the rules committee. I don't know."

**18.** They pointed to the 2008 vote totals in Howard County for the presidential candidacy of Barack Obama.

And, the Circuit Administrative Judge—because I'm the counterpart in our jurisdiction, clearly the rules provide that the obligation of that person once a judge determines the case, should be removed for a pretrial publicity or other reasons, then determines to which jurisdiction it should go. And there is nothing in the rules, that requires [a] hearing, and you've acknowledged that from the Plaintiff[s'] standpoint, but that process is an administrative function. But now that the case is here, and I don't think the *Batson* argument should be extended to this situation. Clearly, that can be brought up at voir dire, either challenging the, you know, the array itself, or certainly, any strikes that the Defendants make.

So, I don't believe there's any evidence presented that a fair and impartial jury cannot be found in Howard County, so I'm going to deny the motion.

On January 11, 2010, just before voir dire of potential jurors began, appellants' counsel renewed the motion to transfer the case back to Baltimore City.[19] The Jury Commissioner, Steve Merson, was called as a witness and testified that as to racial composition, the array was "a typical Howard County jury panel." After argument, the court denied the renewed challenge to the removal from the City. After the jury, which included one African American, was seated, appellants' counsel again objected to the racial composition of the jury and the motion was again denied.

After a seven-day trial, Judge Leasure granted appellants' motion for judgment against appellees Colburn and Hayes with respect to the false imprisonment and false arrest of Gerard.[20] The court also granted Detective Bennett's motion

---

**19.** Appellants' counsel observed: "I'm not an expert, but it appears as if there were five African Americans out of a jury panel of fifty individuals. As suspected, this is not representative in any way a similar panel—panel would have been in Baltimore City."

**20.** Specifically, the court found that Gerard's warrantless arrest by these two officers, who were not present during the alleged misdemean-

for judgment as to all counts and dismissed two counts against Officer Grimes. The remainder of the case went to the jury along with the damage claim with respect to Officers Colburn and Hayes. The jury found in favor of the City and its officers and awarded no damages against Officers Colburn and Hayes. This appeal followed.[21]

## DISCUSSION

### I. Was there a reasonable ground to believe appellees could not receive a fair and impartial trial in Baltimore City?

■ At the outset, we are called upon to determine whether the Circuit Court for Baltimore City correctly determined that appellants' case should have been *removed* from the City.[22] This is the relatively rare civil case where defendants successfully obtained removal, in large part, on the basis of prejudicial publicity. *Cf. Hirschkop v. Snead,* 594 F.2d 356, 373 (4th Cir.1979) ("No decision reversing the judgment in a civil action because of prejudicial publicity has been called to our attention.") Nevertheless, the right to a fair and impartial trial is no less deserving of protection in a civil setting as it is in the criminal courts. *See In re San Juan Star Co.,* 662 F.2d 108 (1st Cir.1981), a federal civil rights action alleging a police conspiracy to kill two suspected terrorists, where a federal appellate court noted:

> We recognize that criminal trials might be thought to present even more compelling fair trial rights than do civil trials, but think that the importance and potential effects of this case sufficient to justify scrupulous care for those rights here.

or, was not authorized by statute, *viz.* Md.Code (2001 and 2008, 2008 Repl.Vol.), Criminal Procedure Article, § 2–202.

**21.** Appellees noted a protective cross-appeal, which they later withdrew.

**22.** Issues raised by the *transfer* of the case to the Circuit Court for Howard County will be considered in Parts II and III of this opinion.

*Id.* at 118. *See also* Robert Trager, Sandra Moriarty & Tom Duncan, *Selling Influence: Using Advertising to Prejudice the Jury Pool,* 83 Neb. L.Rev. 685, 711 (2005).

## A. Legal Framework / Standard of Review

Removal of a civil case for local prejudice is governed by two provisions: Article IV, § 8(c) of the Maryland Constitution and Md. Rule 2–505(a)(1) and (b). Section 8(c) of Article IV of the Constitution provides:

> In all other cases of presentment and indictment, and in all suits or actions at law or issues from the Orphans' Court pending in any of the courts of law in this State which have jurisdiction over the cause or case, in addition to the suggestion in writing of either of the parties to the cause or case that the *party cannot have a fair and impartial trial* in the court in which the cause or case may be pending, it shall be necessary for the party making the suggestion to make it satisfactorily appear to the court that the suggestion is true, or that *there is reasonable ground for* the same; and thereupon the court shall order and direct the record of the proceedings in the cause or case to be transmitted to some other court, having jurisdiction in the cause or case, for trial. The right of removal also shall exist on suggestion in a cause or case in which all the judges of the court may be disqualified under the provisions of this Constitution to sit. The court to which the record of proceedings in such suit or action, issue, presentment or indictment is transmitted, shall hear and determine that cause or case in the same manner as if it had been originally instituted in that Court. The General Assembly shall modify the existing law as may be necessary to regulate and give force to this provision.

(emphasis added). Md. Rule 2–505(a)(1) states:

> In any action that is subject to removal, and on issues from the Orphans' Court, any party may file a motion for removal accompanied by an affidavit alleging that the party cannot receive a fair and impartial trial in the county in which the action is pending. If the court *finds that there is reasonable ground to believe that the allegation is correct, it shall order that the action be removed for trial to a court of*

*another county.* Any party, including a party who has obtained removal, may obtain further removal pursuant to this Rule.

(emphasis added). In addition, subsection (b) of this rule provides:

> *The Circuit Administrative Judge of the court ordering removal shall designate the county to which the case is to be removed.* When the court orders that the action be removed for trial to a court of another county, the clerk shall transmit the record to that court within five days from entry of the order, unless the court ordering the removal extends the time. The record shall consist of all the original papers filed in the action and copy of the docket entries.[23]

(emphasis added). In *Hoffman v. Stamper,* 155 Md.App. 247, 284, 843 A.2d 153 (2004), *aff'd. in part and rev'd. in part,* 385 Md. 1, 867 A.2d 276 (2005), this Court said:

> The threshold question for the circuit court on a motion for removal—whether there is reasonable ground to believe the allegation that the moving party cannot receive a fair and impartial trial in the county in which the action is pending—is a mixed question of law and fact concerning a constitutional right. Accordingly, on appeal, we review that threshold determination *de novo.*

The party seeking removal bears the burden to show that he or she "has been prejudiced by adverse publicity and that the *voir dire* examination ... will not be adequate to assure ... a fair and impartial trial by jury." *Id.* at 284–85, 843 A.2d 153.[24] In addition, the defendant "must show not only that there has been publicity about this case but also that there is reason to believe that the publicity about him will prejudice his rights." *Id.* at 287, 843 A.2d 153.

---

**23.** The history of subsection (b) of Md. Rule 2–505 is discussed in Part III of this opinion.

**24.** In *Simms v. State,* 49 Md.App. 515, 518, 433 A.2d 1199 (1981), this Court said that a party moving for a change of venue carries "a heavy burden" of satisfying the court that there is so great a prejudice against him that he or she cannot obtain a fair and impartial trial.

## B. Analysis

■ Whether we gauge the removal decision under an abuse of discretion standard or *de novo* as a mixed question of fact and law, we believe that Judge Murdock correctly determined that removal from Baltimore City was justified under Article IV, § 8 and Md. Rule 2–505. The publicity about this case, recounted on pp. 5–12, *supra*, was pervasive, negative, continuing and prejudicial. News stories themselves described the extent of media saturation and the public outrage stirred up by the police arrests of Gerard and Dinkins. *See* pp. 7 & 8, *supra*. Even appellants' counsel, at the September 23, 2008 removal hearing, noted that the case had gotten such national and international publicity that there was probably "no place in the State of Maryland where this case could be removed to."

Although appellees were rarely, if ever, mentioned by name, the accounts and commentary were specific to the officers involved. Their actions spurred demonstrations, denunciations and demands for a City boycott, all duly reported in the media. High-ranking public officials, including their ultimate employer, the Mayor, criticized the officers' conduct; and community activists called for their ouster, sometimes in the most fiery of terms ("thugs in uniforms" and "If they want war, they'll have war"). In various accounts, the arrests were portrayed as a symbol of deteriorating police/community relations and Gerard was described as traumatized and a victim of a civil rights violation.

Appellants contend that there was no reason for Judge Murdock to change her prior ruling on the removal motion or alter her earlier conclusion that *voir dire* was the proper remedy to deal with the issue of prejudicial publicity. However, the media reaction to the "laughing police dispatcher" transcript, *see* pp. 11–12, *supra*, undoubtedly made it clear to the court that prejudicial publicity would continue to occur.[25]

---

**25.** There were other instances in the record of negative publicity about the officers that appeared even without a stimulus. For example, a

Moreover, the court's initial ruling was hardly a stinging rejection of the removal request, as the judge noted that "this is a tough one" and that she was "troubled" by the Mayor's public statements.

The court's September 23, 2008 decision to order removal of the case from Baltimore City relied on more than "extensive negative publicity." It also explained that waiting for *voir dire* would not be appropriate in light of statements made by high-ranking city officials [26] and because "[t]here were demonstrations held in the City demanding that the Defendants be terminated and prosecuted." This finding of a Cityunique source of continuing local resentment is a reasonable ground to believe that appellants could not receive a fair trial in Baltimore City even with the assistance of *voir* dire. It is also a response to appellants' argument before Judge Leasure that any prejudice would not be cured by a transfer from the City because the same media outlets served both Howard County and Baltimore City. Clearly, a Howard County jury would not have been as affected by statements of public officials from another jurisdiction or the community reaction in the City.

For these reasons, we conclude there was no error in Judge Murdock's decision to remove the case from Baltimore City or in Judge Leasure's decision not to return the case to its original venue.

## II. Did equal protection require the case to be transferred to a jurisdiction with the city's racial demographics?

▆ Under the banner of due process, appellants argued to Judge Leasure [27] that the true purpose of appellees' attempt

---

story about the City crime rate discussed Gerard's arrest and an "anniversary" account of the arrest contained an extremely unfavorable portrayal of the events.

26. Undoubtedly, appellants, as they attempted in Howard County, would have tried to call Mayor Dixon as a witness in the case.

27. Prior to removal, these constitutional claims were not presented to the Circuit Court for Baltimore City. Thus, appellees argue that the

to remove the case from Baltimore City was to unconstitution-
ally obtain "a more racially favorable venue." They also
contended that the Supreme Court's decision in *Batson* ap-
plied to racially discriminatory venue transfers and that if a
removal out of the City was to be ordered, appellants were
entitled to venue in a jurisdiction comparable to the City's
racial demographics. *See* n. 16, *supra.*[28]

Although no Maryland case addresses these issues, out-of-
state authorities and commentaries are plentiful, typically in
the criminal arena.[29] *See e.g., House v. Hatch,* 527 F.3d 1010
(10th Cir.2008); *Mallett v. Bowersox,* 160 F.3d 456 (8th Cir.
1998); *Maryland v. Brown,* 426 F.2d 809 (4th Cir.1970); *U.S.
v. Douglas,* 837 F.Supp. 817 (N.D.Tex.1993); *Goins v. Ange-
lone,* 52 F.Supp.2d 638 (E.D.Va.1999); *James v. State,* 613
N.E.2d 15 (Ind.1993); *State v. House,* 127 N.M. 151, 978 P.2d
967 (1999); Darryl K. Brown, *The Role of Race in Jury
Impartiality and Venue Transfers,* 53 Md. L.Rev. 107 (1994);
Kevin Duffy, *Batson Revisited: Discriminatory Venue Trans-
fers and the Scope of Supreme Court Precedent,* 36 Rutgers L.
Rec. 13 (2009); Peter M. Kougasian, *Should Judges Consider
the Demographics of the Jury Pool in Deciding Change of
Venue Applications?,* 20 Fordham Urb. L.J. 531 (1993); *Note:
Out of the Frying Pan and into the Fire: Race and Change of*

---

transferee court could not have entertained them or reviewed the
actions of the transferor court. Because of our disposition of the issues
in this case, we need not decide this question. *But cf. Nace v. Miller,*
201 Md.App. 54, 28 A.3d 737 (2011) (In a *forum non conveniens* setting,
a transferee court is not prevented from reviewing a motion to re-
transfer to the transferor court.)

**28.** By invoking *Batson,* appellants were essentially making an equal
protection claim, not one premised on a violation of substantive due
process. Their broad assertion of a violation of the 14th Amendment to
the U.S. Constitution and Article 24 of the Maryland Declaration of
Rights, *see* n. 1, *supra,* and the tenor of their arguments, necessarily
reflected an equal protection claim.

**29.** While many of the authorities discuss *Batson* and equal protection,
they also wrestle with the Sixth Amendment's requirement that a jury
in a criminal case reflect a fair cross section of the community.
Obviously, this latter issue is not presented in this civil case.

*Venue after Rodney King,* 106 Harv. L.Rev. 705 (1993); *Note: Change of Venue in Criminal Cases: The Defendant's Right to Specify the County of Transfer,* 26 Stan. L.Rev. 131 (1973– 74).[30] Supreme Court cases are not conclusive. *See Mallett v. Missouri,* 494 U.S. 1009, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990) (opinion of Justices Marshall and Brennan dissenting from the denial of certiorari) ("Just as state prosecutors may not use preemptory challenges to exclude members of the defendant's race from the jury ... state trial courts may not treat removal of the trial to accomplish the same result by another means"); *Mobile v. Bolden,* 446 U.S. 55, 77, n. 28, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality opinion) ("[T]he fact that there is a constitutional right to a system of jury selection that is not purposefully exclusionary does not extend a right to a jury of any particular racial composition"). *See also House v. Hatch,* 527 F.3d at 1021 ("No Supreme Court case holds that venue transfers are subject to scrutiny under the Equal Protection Clause.").

Those federal and state courts that have addressed the issue appear divided, although more decline to apply *Batson* to venue transfer decisions. *Compare, House v. Hatch,* 527 F.3d at 1022 (*Batson's* application to venue transfer is "not clearly established law"); *Mallett v. Bowersox,* 160 F.3d 456, 460 (8th Cir.1998); *Epps v. Iowa,* 901 F.2d 1481, 1483 (8th Cir.1990); *Goins v. Angelone,* 52 F.Supp.2d 638, 666 (E.D.Va.1999) (*Batson's* application to selection of venue was not so significant or obvious that failure to raise the claim constituted ineffective assistance of counsel); *Rogers v. Director,* 864 F.Supp. 584, 598 (E.D.Tex.1994); *State v. Jones,* 647 N.W.2d 540, 543–44 (Minn.App.2002); *Simon v. State,* 688 So.2d 791, 803–04 (Miss. 1997); *Mallett v. State,* 769 S.W.2d 77, 81 (Mo.1989), *cert. denied,* 494 U.S. 1009, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990) ("We find *Batson* of limited usefulness in analyzing movant's

---

**30.** Our research discloses that only the courts in Indiana have considered this issue in a civil case. *See Martin v. Amoco Oil Co.,* 679 N.E.2d 139 (Ind.App.1997), *vacated on other grounds,* 698 N.E.2d 1191, *aff'd.* 696 N.E.2d 383 (Ind.1998); and *Osmulski v. Becze,* 638 N.E.2d 828 (Ind.App.1994).

claim, which involves procedures for changing venue . . .")
with *State v. House,* 127 N.M. 151, 978 P.2d 967, 993 (1999);
*Martin v. Amoco Oil Co.,* 679 N.E.2d 139, 146 (Ind.App.1997);
and *Osmulski v. Becze,* 638 N.E.2d 828, 833–35 (Ind.App.
1994). *But see, James v. State,* 613 N.E.2d 15, 29 (Ind.1993)
(In a change of venue case, "we need not decide . . . whether
[the *Batson* ] analogy could ever be appropriate. . . .").[31]

We need not decide whether *Batson* should be applied to
allegations of a racially discriminatory venue transfer, because
even under the *Batson* methodology, appellants' two-pronged
discrimination attack would fail.

▆▆▆ If *Batson* were applicable here, once a prima facie
case has been made by showing that members of the party's
race were substantially under-represented on a venire selected
under a practice providing the opportunity for discrimination,
*Douglas,* 837 F.Supp. at 822, then:

> the burden shifts to the State to explain adequately the
> racial exclusion. . . . The State cannot meet this burden on
> mere general assertions that its officials did not discrimi-
> nate or that they properly performed their official
> duties. . . . Rather, the State must demonstrate that permis-
> sible racially neutral selection criteria and procedures have
> produced the monochromatic result.

*Batson,* 476 U.S. at 94, 106 S.Ct. 1712 (quotations omitted).
Appellants alleged both an intentionally discriminatory act in
appellees' attempt to escape an African–American jury in
Baltimore City and a racially discriminatory effect in the
transfer of the case to a majority white jurisdiction with an
African–American population of only 18%.[32] Applying essen-

---

**31.** Some legal commentators have read *Batson* as authorizing if not
requiring courts to take racial demographics into account in ordering
venue transfers. *See e.g.,* Kougasian, *supra,* at 550 and Duffy, *supra* at
24.

**32.** Appellant's discriminatory effect argument is premised on gross
population numbers. *Douglas,* 837 F.Supp. at 817, n. 7 notes the
argument that an equal protection claim with respect to a discriminato-

tial components [33] of the *Batson* formula to the charge of purposeful discrimination, we note that a race-neutral reason for the transfer clearly existed, *viz.*, the presence of highly prejudicial publicity and local prejudice that jeopardized appellees' right to a fair and impartial trial. *See State v. House*, 978 P.2d at 993–94; *Martin*, 679 N.E.2d at 146. Moreover, appellees—who are not "the State" for *Batson* purposes—could not have guaranteed that the case would be transferred to a majority white jurisdiction. That decision was not within their control. The choice of Howard County was made by the Circuit Administrative Judge for Baltimore City, presumably based on racially neutral administrative concerns. *See* pp. 28–29 and n. 37, *infra*. Thus, appellants could not have made a case for purposeful discrimination by either appellees or the Circuit Court for Baltimore City.

The discriminatory effect claim, which was made only in Howard County, fares no better. Appellants have failed to show that selection of the transferee forum by the administrative judge provided an "opportunity for discrimination" or that it was not based on "permissible racially neutral selection criteria." Ultimately, appellants' discriminatory effect contention is reduced to an asserted right to a transferee court jury with a demographic or racial composition comparable to that of the transferor jurisdiction. Even courts that apply *Batson* to venue transfers have not recognized such a right. *See State v. House*, 978 P.2d at 995. See also p. 25, supra.

For all of these reasons, we conclude that there was no equal protection violation in the transfer of appellants' case from Baltimore City or the trial of the case in Howard County.[34]

---

ry venue should be based on statistics of the eligible population for jury service, not gross population statistics.

**33.** We need not address all of the factors under the *Batson* test, because it is clear that appellants cannot show the decisive elements.

**34.** Other than a legally insufficient "numbers" argument, appellees do not appear to contend that they could not have obtained (or did not

### III. Did Due Process require appellants to be heard in the transferor court on the designation of a new venue?

■ In the Howard County Circuit Court, appellants argued that they had a due process right to a hearing in the Circuit Court for Baltimore City on the designation of the transferee jurisdiction and an attendant right to have the Administrative Judge give a reason for the selection of the new venue.[35] Judge Leasure ruled that the Maryland Rules did not require a hearing and that designation of the new venue was "an administrative function." Without a doubt, this is a correct reading of Md. Rule 2–505(b), which states that in ordering removal, the Circuit Administrative Judge "shall designate" the county to which the case is to be removed.

■ Until July 1, 2001, the trial judge designated the circuit court where the case was to be removed with the approval of the Circuit Administrative Judge. *See* former Md. Rule 16–101, 27 *Md. Reg.* 1908, 1951 (Oct. 20, 2000). If a case was to be removed to a jurisdiction outside the circuit, the administrative judge of the transferor circuit was obliged to make inquiry of his or her transferee counterpart "concerning the trial calendar and judicial work loads of any Court to which it is contemplated the action may be removed and give consideration to the recommendations of such Circuit Administrative Judge."[36] Prior to the 2001 rule change, Maryland caselaw

---

obtain) a fair and impartial trial in Howard County. Even if asserted, we find that the record would not support such a charge.

**35.** This contention was not made to either Administrative Judge Holland or Judge Murdock.

**36.** Some 140 years ago, the Court of Appeals identified the following factors as governing the discretion of the transferor court:

[I]t is eminently proper that there should be a large discretion reposed in the Judges as to the Courts to which the record should be transmitted. Expedition of trial, convenience to the parties concerned, and witnesses, economy, as well as various other matters, often, and most generally do, enter into the considerations that influence the discretion of the Judges in selecting the Court to which to transmit the record for trial; and no construction would be

described the transferor's court's discretion in broad terms. *See, e.g., Middleton v. Morgan,* 263 Md. 154, 158, 282 A.2d 94 (1971) ("It is established that the trial court must and does exercise discretion in selecting the court to which a case will be removed...."); *Smith v. Pearre,* 96 Md.App. 376, 385, n. 4, 625 A.2d 349 (1993) ("Where to move a case is within the exercise of judicial discretion...."). However, merely because the Circuit Administrative Judge exercised some degree of discretion under both the old rule (and does so under the new rule), does not mean that a hearing is required on the selection of the jurisdiction where the case was to be removed. *See Smith v. State Farm Mut. Auto. Ins. Co.,* 169 Md.App. 286, 302, 900 A.2d 301 (2006) (concluding that Md. Rule 2–311(f) did not require a court to hold a requested hearing on the transfer of a case to another jurisdiction because of *forum non conveniens* ).

Just because Rule 2–505(b) does not contemplate or require a hearing on the designation of the transferee forum does not answer the due process question appellants have raised. At least one court has said in a criminal case that its rules "impliedly [require] the court in which the action is pending to conduct an evidentiary hearing before deciding where the cause should be transferred," because "[i]f *rule 842* is construed to authorize a determination of new venue ex parte a grave doubt of its constitutionality upon due process attack would arise." *McGown v. Superior Court of Fresno County,* 75 Cal.App.3d 648, 142 Cal.Rptr. 262, 264 (1977).[37]   Other

---

beneficial to the public that would restrict or preclude such considerations in a large proportion of the removals that occur.

*Kimball v. Harman,* 34 Md. 401, 406 (1871). *Jones v. State,* 185 Md. 481, 486, 45 A.2d 350 (1946) added another important consideration: "[I]t is the duty of the court to order a removal of the record to some jurisdiction where the jury will not be prejudiced." Although these factors are not set forth in Md. Rule 2–505(b), they are clearly still controlling.

**37.** *But see, People v. Stanley,* 10 Cal.4th 764, 42 Cal.Rptr.2d 543, 897 P.2d 481, 496 (1995) (An evidentiary hearing is not required where there were no factual issues to be resolved before determining the place to which the case would be transferred).

decisions that have considered the issue of the right to a hearing on the selection of the transferee jurisdiction have dealt with procedures and fact patterns different than what we find here. *See Gotbaum v. City of Phoenix,* 617 F.Supp.2d 878, 880 (D.Ariz.2008) (denying request for oral argument on transfer motion); *Mallett v. State,* 769 S.W.2d at 80 (rejecting contention that defendant was denied the lack of opportunity to be heard when he "was able to, and did express, his venue preferences as well as his concern that there be potential black jurors"); *Aranda v. State,* 736 S.W.2d 702 (Tex.Crim. App.1987) (trial court decision to order a change of venue *sua sponte* was not improper where the defendant was given notice that the court would hear evidence on the proposed transfer).[38]

We find these authorities of little help in deciding appellants' due process question. First, this is not a criminal case where the stakes are higher for the defendant, whose life or liberty may be at stake. Rather, this is a civil case and the U.S. Supreme Court has noted: "Due process does not, of course, require that the defendant in every civil case actually have a hearing on the merits." [39] *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

Second, while under certain circumstances a plaintiff in a civil case may have a "vested property right in a cause of action," *Dua v. Comcast,* 370 Md. 604, 633, 805 A.2d 1061 (2002), he or she cannot be said to have a property right deserving of due process protection in the composition of the jury in a transferee jurisdiction. *See Mobile v. Bolden,* 446 U.S. at 77, n. 24, 100 S.Ct. 1490. Third, appellants' primary purpose in seeking a hearing on the proposed venue would have been to argue their entitlement to transfer to a majority

---

**38.** One author has said that "a motion for change of venue is not effective unless the defendant has knowledge of the transferee county in advance of deciding whether to move for a change of venue." *Change of Venue in Criminal Cases, supra,* at 154.

**39.** The same is obviously true of a plaintiff or a party opposing a motion.

African–American jurisdiction, a right which has repeatedly been rejected by the courts. *See* p. 25, *supra.* Fourth, given this lack of entitlement and the decidedly administrative nature of the factors at play in the Circuit Administrative Judge's selection, it is not clear what purpose would have been served by the hearing. *See* pp. 28–29, and n. 37, *supra.* Finally, in this case, appellants did have a hearing before Judge Leasure on the allegedly erroneous transfer and the inappropriateness of the Howard County venue. Moreover, as long as the transferee court has the power to hear and act on a contention, such as that made by appellants in the trial court, that they could not have obtained a fair trial in Howard County, this sufficiently protects the parties' interests.

■ For all of these reasons, we conclude that appellants were not denied procedural due process by the lack of a hearing before the Circuit Court for Baltimore City on the selection of Howard County as the transferee venue.[40]

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

---

**40.** For the same reasons discussed above, there was no due process right offended when the Circuit Administrative Judge in Baltimore City did not specify the reasons for the selection of Howard County. Quite obviously those reasons were grounded in the neutral criteria associated with judicial administration, such as workload, convenience, etc. *See* pp. 28–29 and n. 37, *supra.*